**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* GERALDINE J. JOHNSON, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CIV-20-00018-JD |
| S. BLAKE KELLY, M.D., and KELLY MEDICAL, P.C., d/b/a OKLAHOMA PAIN CENTER, | ) | |
| Defendants. | ) | |

**ORDER**

Before the Court is Defendants S. Blake Kelly, M.D. and Kelly Medical P.C. d/b/a Oklahoma Pain Center's ("Defendants") Motion for Reconsideration of the Court's March 30, 2026 Summary Judgment Decision and Order. [Doc. No. 116]. Plaintiff United States of America ("Plaintiff") filed a Response in opposition [Doc. No. 118], and Defendants filed a Reply [Doc. No. 120]. For the reasons outlined below, the Court grants in part and denies in part the Motion.

The relevant background of this case and material undisputed facts are outlined in the Court's order regarding the parties' cross-motions for summary judgment. [Doc. No. 111 at 1–7].[1] The Court incorporates the material undisputed facts and background by reference.

---

[1] The Court uses CM/ECF page numbering from the top of the district court docket filings in this order.

## I. <u>STANDARD OF REVIEW</u>

"[A] district court always has the inherent power to reconsider its interlocutory rulings[.]" *Warren v. Am. Bankers Ins. of Fla.*, 507 F.3d 1239, 1243 (10th Cir. 2007). Federal Rule of Civil Procedure 54(b) provides that "any order . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."

The Tenth Circuit reviews the Court's denial of a motion for reconsideration for abuse of discretion. *See Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1235 (10th Cir. 2001). Although not required to consider the factors outlined in *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000), which apply to motions for reconsideration of final judgments, the Court may consider them as a framework for its analysis. *Luo v. Wang*, 71 F.4th 1289, 1298–99 (10th Cir. 2023). Accordingly, grounds for a motion to reconsider include the following: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of Paraclete*, 204 F.3d at 1012 ("[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law.").

Here, Defendants base their Motion upon a need to correct clear error. [*See* Doc. No. 116 at 1, 3].

## II. <u>ANALYSIS</u>

Defendants raise the following alleged legal errors in the Court's order. First, Defendants argue that the Court improperly resolved contested inferences and made

credibility determinations in favor of Plaintiff. Second, Defendants state that the Court analyzed falsity under the incorrect standard. Third, Defendants assert that the Court applied an objective rather than a subjective scienter standard to Plaintiff's FCA claim. Fourth, Defendants state that the Court incorrectly analyzed materiality. And lastly, Defendants contend that the Court should narrow its order to Medicare claims only.[2]

### A. The Court did not make improper inferences or credibility determinations.

Defendants first argue that the Court drew improper inferences from certain material, undisputed facts. Defendants state that the Court inferred that presumptive testing lacked clinical value and that Dr. Kelly knew it lacked clinical value from Plaintiff's undisputed facts. [Doc. No. 116 at 4]. Defendants also state that the Court drew this inference from the following undisputed facts: Defendants were ordering the presumptive and definitive tests together; the providers received the results from the tests in the same report; and the documentation regarding whether the providers reviewed the presumptive results before ordering the definitive tests was inconsistent. [*Id.*].

The Court did not infer that presumptive test results lacked clinical value. Instead, based on the undisputed summary judgment evidence, the Court concluded that Defendants' providers were not using the presumptive test results for any purpose. [Doc. No. 111 at 19]. The Court summarized Plaintiff's summary judgment evidence that demonstrated that Defendants were running presumptive UDT and definitive UDT on the

[2] Defendants withdrew their argument in Section II.C of the Motion. [*See* Doc. No. 120 at 2].

same urine specimens and receiving the results at the same time; providers did not need or use the presumptive UDT results; and providers did not specifically order presumptive tests. [*Id.* at 12–14]. However, Defendants did not submit summary judgment evidence that their providers were using the presumptive test results in the diagnosis or treatment of patients. In Defendants' Motion for Summary Judgment, they state that their providers used the results of UDT in the treatment of patients, but they do not specifically state that they used *presumptive* test results in the treatment of patients. [Doc. No. 91 ¶¶ 32, 33]. Accordingly, the Court did not draw any inference that presumptive UDT lacked clinical value but instead, based upon the absence of contradictory evidence presented by Defendants, concluded that the summary judgment evidence demonstrated that Defendants' providers were not using the presumptive UDT for the diagnosis or treatment of patients. [*See* Doc. No. 111 at 20–21].

The Court clearly stated that "Defendants have not presented summary judgment evidence that . . . the presumptive tests were medically necessary." [*Id.* at 20]. The Court also noted as follows:

> Defendants do state that UDT were medically necessary. [Doc. No. 91 at 24–25]. However, Defendants' argument contains no reference to how providers were specifically requesting or using *presumptive* UDT results. [*See id.*]. Instead, Defendants rely on arguments that presumptive and definitive UDT collectively were medically necessary. [*See id.*]. They also argue that the presumptive UDT "were rendered." [*Id.* at 25]. However, the fact the OPC ran the tests and provided the results to OPC providers does not transform them into medically necessary tests. Despite the voluminous testimony of OPC providers in this case, Defendants do not cite the testimony of one provider stating that he or she used presumptive UDT results for any purpose.

[*Id.* at 20–21 n.10]. The Court, therefore, drew no inferences regarding the clinical value of presumptive UDT but instead concluded Defendants had produced no summary judgment evidence that their providers were *using* that clinical value for treatment of patients.

1. The Court did not make a credibility determination regarding Dr. Kelly's affidavit.

Defendant argues that the Court discounted Dr. Kelly's affidavit, thus making an improper credibility determination. [Doc. No. 116 at 5]. However, the Court made no such credibility determination. Defendants presented Dr. Kelly's carefully worded affidavit in support of its Motion for Summary Judgment. [Doc. No. 91-23]. The Court quoted the exact language of the affidavit in its order. [Doc. No. 111 at 19–20 (quoting Doc. No. 91-23 ¶¶ 21–26)].

The sequence in which the affidavit outlines how Defendants ran presumptive testing gives an impression that providers had access to presumptive testing results before definitive UDT were run: "[t]he results of the presumptive test would be available to the providers after the test was conducted." [Doc. No. 91-23 ¶ 24]. However, the undisputed facts demonstrate that Defendants ran a presumptive test on a specimen, then ran the definitive test on the same specimen, and provided these results to providers at the same time. Dr. Kelly's affidavit confirms this scenario, stating that "[a]fter all tests were completed, the results were printed and placed in the patient's EMR or chart." [*Id.* ¶ 26]. The Court noted that OPC providers occasionally received presumptive results verbally

before definitive results, but the summary judgment evidence, including Dr. Kelly's affidavit, indicates this was not OPC's routine practice. [*See* Doc. No. 111 at 4].

The Court's analysis of his affidavit did not state anything he said was true or untrue but instead attempted to parse the manner in which Dr. Kelly presented the information. Additionally, Defendants' allegation that the Court "discounted [his] testimony" has no relevance to the topics Defendants argue Dr. Kelly's affidavit established: "LC-MS presumptive testing produced clinically valuable information; that providers reviewed and used those results; that the workflow reflected his good-faith understanding of regulatory requirements; and that he relied on his paid compliance consultants, who advised that screen and confirm should be ordered together." [Doc. No. 116 at 5].[3]

2. The Court did not choose between competing characterizations regarding the Qualitative Intake Form.

Next, Defendants argue that the Court credited Plaintiff's characterization of the Qualitative Intake Form over Defendants' characterization. [Doc. No. 116 at 6]. In the material undisputed facts, the Court noted that Defendants began the practice of using Qualitative Intake Forms, which documented the UDT performed for particular patients. [Doc. No. 111 at 4]. In a footnote, the Court noted the parties' competing characterizations of the purpose of the form. [*Id.* at 4 n.7].

[3] The Court notes that the affidavit itself does not actually state that providers used presumptive results. Instead, it states "OPC providers, including myself, used the laboratory results of the UDTs in treatment of the patients." [Doc. No. 91-23 ¶ 8]. The affidavit does not state that providers were using presumptive tests in the treatment of patients but only refers to UDT generally. [*See id.*].

The only place the Court considered the Qualitative Intake Form in its analysis was when considering the materiality of Defendants' claims for presumptive UDT. The Court considered the Qualitative Intake Form in connection with the weight given to the 2018 audit of OPC's UDT claims. [*See* Doc. No. 111 at 24]. The Court cites Dr. Kelly's own testimony that the medical records provided during the 2018 audit included the Qualitative Intake Form and that they did not tell the auditors that OPC completed those forms after they ran UDT. [Doc. No. 93-1 at 74 (191:17–23)].

The Court did not credit Plaintiff's interpretation that Defendants created the Qualitative Intake Form for the purpose of making presumptive UDT falsely appear medically necessary. [*See* Doc. No. 111 at 4 n.7]. Instead, the Court concluded that, without knowledge that OPC completed the Qualitative Intake Forms after performing testing, the Qualitative Intake Form provided support that OPC was performing UDT pursuant to providers' orders. [*See id.* at 24 ("After the 2014 audit, OPC introduced the Qualitative Intake Form, which OPC personnel completed *after* the lab performed UDT and placed in patients' files so that they had supporting documentation that physicians ordered the UDT, supporting a conclusion they were medically necessary.")]. The Court refers only to UDT generally and not to presumptive UDT specifically. [*See id.*]. The Court's conclusion also incorporates Defendants' stated purpose for the form which was "additional documentation supporting the purpose of the original UDT order which was already in the patient's EMR or chart." [*Id.* at 4 n.7]. Defendants do not explain how the Court's characterization is inconsistent with their own characterization of the Qualitative Intake Form.

**B. The Court assessed whether OPC's medical necessity certifications were false under the correct standard.**

For the first time in its Motion for Reconsideration, Defendants argue that the Court must assess the falsity of medical-necessity certifications under the "rigorous multi-factor analysis" outlined by the Tenth Circuit in *United States ex rel. Polukoff v. St. Mark's Hospital*, 895 F.3d 730 (10th Cir. 2018). [Doc. No. 116 at 7–9]. In *Polukoff*, the court concluded that it must define what is "false or fraudulent" under the FCA broadly: "[w]e thus hold that a doctor's certification to the government that a procedure is 'reasonable and necessary' is 'false' under the FCA if the procedure was not reasonable and necessary under the government's definition of the phrase." 895 F.3d at 743. In that case, the government defined "reasonable and necessary" in accordance with the definition found in the Medicare Program Integrity Manual, which contains the factors Defendants assert the Court should have applied here. *See id.* at 743–44. But Defendants do not cite other cases relying upon these factors as the requisite framework for what is reasonable and necessary. Nor is the Court convinced that is the appropriate analysis.

Defendants also argue that the clinical value of the presumptive testing precludes summary judgment because "Defendants' summary judgment record establishes that LC-MS presumptive testing produced quantitative results, identified specific drug metabolites and adulterants not detectable on definitive panels, and provided clinically actionable information independent of any 'gating' function." [Doc. No. 116 at 9]. However, in response to Plaintiff's Partial Motion for Summary Judgment, Defendants did not argue that the clinical value of presumptive testing was relevant to the falsity analysis, nor did

they present any argument regarding falsity, instead focusing on materiality and scienter. [*See* Doc. No. 101]. Defendants also did not move for summary judgment upon falsity. [*See* Doc. No. 91].[4] Accordingly, as that argument was not before the Court, the Court did not err by not considering it. Motions for reconsideration "should not be used to revisit issues already addressed or advance arguments that could have been raised earlier." *United States v. Huff*, 782 F.3d 1221, 1224 (10th Cir. 2015) (citation omitted).

However, upon consideration of the parties' briefing related to the Motion for Reconsideration, the Court takes this opportunity to clarify its ruling regarding falsity. As outlined above, Defendants did not present legal argument countering Plaintiff's falsity allegations. In its summary judgment order, the Court outlined the manners in which Plaintiff alleged Defendants' claims were false. [Doc. No. 111 at 9–10]. The Court also discussed the falsity of the claims in context of its scienter analysis. [*See id.* at 10–21]. To the extent that the Court's analysis was unclear, the Court concludes that Plaintiff carried its burden regarding falsity. Defendants failed to identify the manner in which they used presumptive UDT results, thus not rebutting Plaintiff's summary judgment evidence that the UDT were not reasonable and necessary to the treatment of patients. [*See* Doc. No. 111 at 19 ("Defendants undoubtedly were not doing that and instead had a protocol of

[4] In fact, in Plaintiff's response to Defendants' motion for summary judgment, Plaintiff noted that the presentment, falsity, and damages elements of Plaintiff's claims were not disputed by Defendants, and Defendants did not file a reply. [*See* Doc. No. 99 at 22 ("Defendants do not challenge the United States' proof on presentment, falsity, or damages under the FCA or common law claims. The evidence of falsity as to the presumptive UDT claims is undisputed and overwhelming.")]. *See also* 31 U.S.C. § 3731(d) (providing that the government must prove "all essential elements of the cause of action, including damages, by a preponderance of the evidence").

running the tests on the same specimen without using the presumptive results to inform the definitive, thus rendering the presumptive test medically unnecessary."); *id.* at 20–21 ("Defendants have not presented summary judgment evidence that (1) the presumptive tests were medically necessary or (2) they believe they could properly submit claims for medically unnecessary presumptive UDT." (footnote omitted))]. Accordingly, no genuine issue of material fact exists regarding the falsity of the claims.

**C. The Court properly analyzed scienter under a subjective standard.**

Defendants next argue that the Court improperly applied an objective standard to determine scienter. [Doc. No. 116 at 9].

First, Defendants argue that the Court erred by not considering Dr. Kelly's confusion over what the regulations required. [*Id.* at 9–10]. Defendants quote the Court's statement "the Court does not consider Defendants' summary judgment evidence of 'Dr. Kelly's genuine attempt to follow proper procedures and lack of intent to defraud.'" [*Id.* at 9 (quoting Doc. No. 111 at 18)]. However, the Court made this statement in the specific context of Defendants' argument that Dr. Kelly lacked intent to defraud because Plaintiff does not have to prove intent to defraud for an FCA claim. *See* 31 U.S.C. § 3729(b)(1)(B) (explaining that proving a defendant "knowingly" submits a false claim requires "no proof of specific intent to defraud"). The Court summarizes the evidence presented by Defendants of Dr. Kelly's lack of intent to defraud and concludes it is not relevant to the scienter inquiry. [Doc. No. 111 at 18]. When summarizing the evidence presented by each party regarding scienter, the Court specifically states that Defendants presented summary judgment evidence that the regulations were confusing. [*Id.* at 19; *see*

*also id.* at 14–15 (summarizing summary judgment evidence regarding regulatory confusion)]. Accordingly, the Court did not disregard Defendants' evidence of Dr. Kelly's subjective confusion about the regulatory requirements.

Defendants also argue that "[e]vidence of government acquiescence in particular billing practices supports an inference that the defendant subjectively believed his conduct was lawful." [Doc. No. 116 at 11]. However, in the case cited by Defendants, the Tenth Circuit states that the "classic example" of government acquiescence is "when the government, with knowledge of the facts underlying an allegedly false claim, authorizes the contractor to make that claim." *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 952 (10th Cir. 2008); *see also United States ex rel. Tate v. Honeywell, Inc.*, No. CIV 96-0098 PK/LFG, 2002 WL 35649591, at *3 (D.N.M. Oct. 17, 2002) (Kelly, J., sitting by designation) (concluding the defendant was entitled to an inference of lack of scienter when it "openly" presented the disputed classification to auditors). However, in this case, Defendants have not presented summary judgment evidence that the government had knowledge of the full facts underlying their claims entitling them to such an inference. The Court also notes that Defendants did not present this argument in their summary judgment briefing, thus it is not an appropriate ground for a motion to reconsider.[5] *See Huff*, 782 F.3d at 1224.

---

[5] Defendants discussed the 2018 audit results in their materiality argument [Doc. No. 91 at 25–26], but Defendants did not present the audit as part of their scienter argument. [*See id.* at 27–33].

Lastly, regarding scienter, Defendants argue that evidence of Dr. Kelly's subjective belief makes the issue inappropriate for resolution upon summary judgment. [Doc. No. 116 at 11–12]. The Court evaluated Dr. Kelly's evidence of his subjective belief. However, all the evidence that Defendants presented of Dr. Kelly's subjective belief supported that Dr. Kelly believed that he had to perform and submit a claim for presumptive testing in order to submit a claim for definitive testing. He did not present summary judgment evidence supporting his subjective belief that his providers did not have to use the presumptive testing for any purpose. As outlined in the Court's order, "[t]he summary judgment evidence supports that they believed the proper procedure was to screen (perform a presumptive UDT), review the results, and then, based on those results, order definitive UDT." [Doc. No. 111 at 16]. Accordingly, the Court did not find summary judgment evidence supporting that Dr. Kelly had a subjective belief he could run presumptive and definitive UDT on the same specimen, not use the presumptive results, and submit claims for both tests as reasonable and necessary.

**D. The Court applied the correct analysis to determine materiality.**

Defendants also argue that the Court did not correctly apply the materiality standard as outlined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) and as applied by the Tenth Circuit. [Doc. No. 116 at 12].

First, Defendants argue that the Court improperly considered the dollar amount tied to the alleged violations and that, under *Escobar*, that is not part of the inquiry for materiality. [*Id.* at 13]. As indicated by Defendants, the inquiry under *Escobar* is a "holistic" one. *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 541

(10th Cir. 2020). Accordingly, the Court's inquiry is not limited to the *Escobar* factors. *Id.* (explaining that the relevant inquiry includes, but is not limited to, the enunciated factors). Defendants do not cite supporting case law that it is improper for the Court to consider the scope of the alleged violation in its materiality analysis.

Second, Defendants state that the Court treated the fact that the Government Health Benefit Programs ("GHBP") condition payment upon certification that a service was medically necessary as dispositive. [Doc. No. 116 at 13]. As stated in *Escobar*, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." 579 U.S. at 194. The Court's order clearly did not treat this factor as dispositive. The Court states that it found this factor relevant but not dispositive and found that multiple other factors support a finding of materiality. [Doc. No. 111 at 22, 23–26].

Third, Defendants state that the Court's reasoning regarding materiality is circular because it "treats Dr. Kelly's alleged concealment as evidence of materiality and then treats the absence of government action as immaterial because the alleged conduct was concealed." [Doc. No. 116 at 13–14].

Plaintiff presented summary judgment evidence that Defendants attempted to make it appear that they were running definitive UDT based upon the results of presumptive UDT, which illustrates "Defendants own belief that the requirements are material." [Doc. No. 111 at 23]. The Court outlined that evidence and considered it as part of its materiality analysis. [*See id.*]. These are the concealment efforts referenced by Defendants.

Defendants argued that the 2018 Novitas audit demonstrated a lack of materiality because it showed the government knew how Defendants were billing and paid the claims. [Doc. No. 116 at 13–14]. In analyzing this argument, the Court concluded that the 2018 audit did not support Defendants' argument because Defendants had not demonstrated that the GHBP were aware that Defendants were not using the results of the presumptive UDT. [*See* Doc. No. 111 at 24–25]. The Court did not base this conclusion upon Defendants' concealment efforts, as stated by Defendants in their Motion, but instead upon Dr. Kelly's own testimony about what Defendants disclosed during the audit. [*See id.* at 24]. Specifically, Dr. Kelly testified that OPC did not inform Novitas that their personnel filled out the Qualitative Intake Form after they ran UDT, nor did they inform Novitas that they provided results of presumptive and definitive UDT at the same time and ordered definitive UDT before running presumptive. [*Id.*]. In *United States ex rel. Janssen v. Lawrence Memorial Hospital*, 949 F.3d 533, 541–42 (10th Cir. 2020), the Tenth Circuit concluded that the government's payment of claims indicated a lack of materiality because a party had complained about the specific billing practices at issue and the government had launched an investigation into those billing practices. *Id.* at 542 ("The record shows that in 2014 NCI conducted an investigation over several months into the central allegations presently at issue and made CMS aware of the quality issues complained of."). Defendants did not present evidence that, in this case, the government was aware of Defendants' specific billing practices and paid their claims anyway.

Thus, the Court does not find support for Defendants' argument that the Court relied upon concealment efforts for a finding of materiality and also in order to discount the impact of the 2018 audit.

**E. The Court declines to narrow the Order.**

Defendants urge the Court to narrow its summary judgment order to Medicare claims only because "[t]he Order's analysis is centered on Novitas (the Medicare contractor) and on Medicare LCD 35006." [Doc. No. 116 at 14]. The Court disagrees. To the extent the Court's order discusses Novitas, it is in relation to the parties' arguments pertaining to the audits. However, as outlined in Plaintiff's Partial Motion for Summary Judgment, each of the GHBP claims at issue have a requirement that claims are for services that are necessary for the treatment of patients. [Doc. No. 93 ¶¶ 30 (Medicare), 37 (TRICARE), 39 (FEHBP)]. At the heart of the Court's analysis is Defendants' knowledge that they were submitting claims for services that were not necessary for the treatment of patients and the materiality of the medical necessity requirement. In their summary judgment briefing, Defendants did not argue that any of the GHBP had different requirements that mandate separate consideration regarding scienter or materiality and did not present payor-specific analysis. Accordingly, Defendants' argument that "[s]weeping non-Medicare claims into the Order without payor-specific analysis is error" cannot stand when Defendants did not present that analysis upon summary judgment.

**F. The Court's order does not require clarification.**

Lastly, Defendants request clarification regarding the scope of the Court's summary judgment ruling. Specifically, Defendants request clarification regarding whether the Court's findings of falsity, scienter, and materiality apply to Plaintiff's other claims and when the Court will address damages. [Doc. No. 116 at 15].

The Court did not adjudicate any claims other than Plaintiff's § 3729(a)(1)(A) claims relating to presumptive UDT. In fact, in its grant of summary judgment to Plaintiff, the Court stated that "the Court GRANTS Plaintiff's Partial Motion for Summary Judgment on its claim under § 3729(a)(1)(A) of the False Claims Act relating to presumptive UDT claims." [Doc. No. 111 at 29–30]. Plaintiff did not move for summary judgment on other claims or argue that the Court's findings on falsity, scienter, or materiality should apply to other claims as well. The Court did not state that it would apply those findings to other claims. Therefore, the Court's summary judgment order did not conclude that those findings will apply to other claims. This does not, however, foreclose the Court from considering the issue in the future.

Second, the Court did not state it is deferring consideration of damages. The Court stated the following regarding damages, which clearly announces the status and nowhere states the Court is deferring the issue:

> Plaintiff provides its treble damages and civil penalties by statute, and Defendants do not contest Plaintiff's damages or damages calculations. Indeed, the amounts of damages underlying Plaintiff's calculations are undisputed and deemed admitted. [*See* Doc. No. 93 ¶¶ 92–96]. However, because not all claims are fully resolved by this order, the Court does not yet impose the judgment.

[*Id.* at 26 n.12]. Accordingly, the Court concludes that its order does not require clarification.

## III. CONCLUSION

The Court grants Defendants' Motion for Reconsideration [Doc. No. 116] to the extent that the Court clarifies its falsity analysis, as discussed above. The Court denies the remainder of the Motion.

IT IS SO ORDERED this 21st day of July 2026.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE